IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-00915

HANNAH BENNETT,
BY AND THROUGH HER CONSERVATOR,
PAUL BENNETT,

    Plaintiff,

v.

CIGNA BEHAVIORAL HEALTH, INC. AND
CIGNA HEALTH AND LIFE INSURANCE COMPANY,

    Defendants.

## COMPLAINT

Plaintiff, Hannah Bennett, by and through her Conservator, Paul Bennett, by through his attorneys, Jeremy A. Sitcoff and Robyn Levin of LEVIN SITCOFF PC, for their Complaint against Defendants, Cigna Behavioral Health, Inc., and Cigna Health and Life Insurance Company, states and alleges as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Plaintiff, Hannah Bennett ("Ms. Bennett"), is and was at all times pertinent an individual residing in the State of Colorado.

2. Paul Bennett, as the Conservator of Hannah Bennett, is and was at all times pertinent an individual residing in the State of Colorado.

3. Defendant, Cigna Behavioral Health, Inc. ("CBH") is, upon information and belief, a corporation existing under the laws of the State of Minnesota with its principal place of business in Eden Prairie, Minnesota. CBH is authorized to conduct and is conducting business in Colorado.

4. Defendant, Cigna Health and Life Insurance Company ("CHLIC"), is, upon information and belief, a corporation existing under the laws of the State of Connecticut with its principal place of business in Hartford, Connecticut. CHLIC is authorized to conduct and is conducting business in Colorado.

5. CBH and CHLIC are collectively referred to as Cigna.

6. This Court has original federal question jurisdiction over this action under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e).

7. Venue is proper in this district as the acts and omissions giving rise to Bennett's claims occurred in this judicial district.

## GENERAL ALLEGATIONS

8. This is an action to recover the costs of residential mental health treatment that Ms. Bennett received while an in-patient at Havenwood Academy ("Havenwood"), a licensed residential center for teen girls located in Cedar City, Utah.

**A.   Ms. Bennett's Mental Health History**

9. Ms. Bennett has a long history of family and mental health struggles.

10. At eighteen months, Ms. Bennett was removed from her birth parents' care by child protective services after her birth parents were found to have neglected and abused her and her birth mother was found to have abused drugs and alcohol during her pregnancy.

11. Thereafter, Ms. Bennett continued to experience familial instability. First, she was adopted by a woman who was ill-equipped to care for a child whose parental rights were eventually terminated and who died shortly thereafter, and then Ms. Bennett was nearly adopted twice, by two separate families, each of whom later decided not to follow through with the adoption.

12. As a result of these traumatic early life experiences, Ms. Bennett was diagnosed with reactive attachment disorder of childhood ("RAD").

13. RAD is a trauma-related disorder that affects young children who have experienced severe emotional neglect commonly found in institutional settings such as foster care or in homes with mentally or physically ill parents.

14. Ms. Bennett displayed the typical symptoms of a RAD diagnosis, including emotionally withdrawn behavior, rarely seeking or accepting comfort, and persistent social and emotional problems including minimal responsiveness, excessive fearfulness, irritability, sadness, rage, and even violence.

15. Children who suffer from RAD are at greater risk of developing anxiety and depression later in life.

16. When Ms. Bennett was six years old, she was adopted out of the Larimer County foster care program by her father, Paul Bennett, and her late mother, Melissa Anne Bennett.

17. The Bennetts worked hard to help their daughter and got her the therapeutic care she needed. However, the relationship between Ms. Bennett and her adoptive mother was strained, in part because of her RAD.

18. As Ms. Bennett aged into adolescence, she and her mother clashed with increasing frequency. Mrs. Bennett's mistreatment escalated to verbal and emotional abuse.

19. Mrs. Bennett would tell her daughter "If I kill myself, it will be your fault," and wanted to remove Ms. Bennett from their home.

20. Although Mr. Bennett interceded and begged his wife to take time and get the help she needed, the effect of this abuse on Ms. Bennett was devastating, especially since she was once again being rejected and abused by a person in a position of trust and love.

21. In September 2017, Mrs. Bennett took her own life after a fight with her daughter that same morning. Despite weekly therapy and family therapy retreats, the cumulative effect of her mother's abuse and suicide sent Ms. Bennett over the edge.

22. Ms. Bennett emotionally withdrew from her father, lashed out both verbally and physically, and began to act out in school with dangerous sexualized behaviors.

23. That winter, Ms. Bennett attempted suicide by medication.

24. By Spring 2018, Ms. Bennett was cripplingly depressed. She began to abuse drugs and alcohol, refused to eat, and neglected to shower for days or to change clothes for months.

25. She continued to act out sexually and rebelled against any restrictions her father attempted to enforce and was asked to leave her private school.

26. Ms. Bennett grew increasingly disrespectful and vulgar, verbally abusing her father and younger sister.

27. Most concerning of all, Ms. Bennett began to tell her father how much she wanted to die and often threatened suicide.

28. On May 5, 2018, Ms. Bennett's verbal and emotional abuse towards her father escalated to physical assault, and Mr. Bennett was forced to call the police.

29. Officer Michael Duffy of the Douglas County Sheriff Department arrived at the Bennetts' home and documented the bites and bruises Ms. Bennett had inflicted on her father as well as the property she had destroyed.

30. Mr. Bennett then presented his daughter with a choice: she could submit to arrest and criminal charges or consent to treatment at Highlands Behavioral Health ("Highlands").

31. Faced with the possibility of going to jail, Ms. Bennett consented to voluntary admission at Highlands that day.

32. During her stay at Highlands, the extent of Ms. Bennett's depression and suicidal ideation became clear, and she was diagnosed with major depressive disorder.

33. On May 12, 2018, Ms. Bennet entered Havenwood with diagnoses of RAD (F94.1), major depressive disorder (F33.2), generalized anxiety (F41.1), and suicidal ideation (R45.851).

34. Havenwood was the only acceptable residential treatment center for Ms. Bennett's condition because it provides 24 hour treatment and care, is a girls-only facility, and focuses specifically on treating early childhood trauma and conditions like RAD.

35. Initially, Ms. Bennett appeared to be doing well or at least to stabilize.

36. However, Ms. Bennett's experiences made her an expert in manipulation and telling therapists and authority figures what they want to hear.

37. In fact, Ms. Bennett continued to struggle with her inclination towards self-harm and suicide, as well as emotional and behavioral regulation.

38. In June 2018, Ms. Bennett resorted back to cutting, a self-harming behavior she struggled with prior to entering Havenwood.

39. In August 2018, Ms. Bennett ran away from Havenwood, broke into a local home and destroyed property, actions for which she was charged with burglary and criminal mischief.

40. While at Havenwood, Ms. Bennett continued to struggle to regulate her emotions and her behavior. Her suicidality remained chronic and the danger she posed to herself did not abate.

41. Ultimately, Mr. Bennett removed Ms. Bennett from Havenwood on or about December 22, 2018, in part because of the financial burden imposed by Cigna's denial of benefits to cover the cost of Ms. Bennett's treatment at Havenwood.

**B.     The Aftermath of Leaving Havenwood**

42. A few months after leaving Havenwood, Ms. Bennett once again started using drugs.

43. In the beginning of June 2019, Ms. Bennett ran away from home.

44. After returning home, Ms. Bennett was reluctant to discuss what had happened in her time away, but she clearly implied that she had been sexually assaulted.

45. A week later, Ms. Bennett consumed a full bottle of Advil in another attempt to take her own life. Thankfully, she began to vomit the medication, and Mr. Bennett was able to monitor her until she was out of danger.

**C.     The Policy**

46. At the time Ms. Bennett entered Havenwood, she was an insured under a health insurance policy issued by CHLIC to Mr. Bennett (the "Policy").

47. The Policy defines Mental Health Residential Treatment Center as:

> an institution which specializes in the treatment of psychological and social disturbances that are the result of Mental Health

> conditions; provides a subacute, structured, psychotherapeutic treatment program. under the supervision of Physicians; provides 24-hour care, in which a person lives in an open setting; and is licensed in accordance with the laws of the appropriate legally authorized agency as a residential treatment center.

48. Under the Policy, Cigna promised to provide coverage for these services, so long as they were "medically necessary," which the Policy defines as:

> …provided for the purpose of preventing, evaluating, diagnosing, or treating a Sickness, Injury, condition, disease or its symptoms, that are all of the following as determined by a Medical Director or Review Organization:
>
> - required to diagnose or treat an illness, Injury, disease or its symptoms;
> - in accordance with generally accepted standards of medical practice;
> - clinically appropriate in terms of type, frequency, extent, site and duration;
> - not primarily for the convenience of the patient, Physician or other health care provider;
> - not more costly than an alternative service(s)…that is as least as likely to produce equivalent therapeutic or diagnostic results with the same safety profile as to the prevention, evaluation, diagnosis or treatment of your Sickness, Injury, condition, disease or its symptoms; and
> - rendered in the least intensive setting that is appropriate for the delivery of the services…. Where applicable, the Medical Director or Review Organization may compare the cost effectiveness of alternative services….when determining least intensive setting.

49. Cigna also maintains specific standards, expectations, and medical necessity criteria for Residential Mental Health Treatment for Children and Adolescents.

50. Under the Policy, the criteria for a continued stay in a residential mental health facility for children and adolescents is as follows:

7

**All of the following must be met:**
1. The individual continues to meet all elements of Medical Necessity.
**2. One or more of the following criteria must be met:**
   A. The treatment provided is leading to measurable clinical improvements in the moderate-to-severe symptoms and/or behaviors that led to this admission and a progression toward discharge from the present level of care, but the individual is not sufficiently stabilized so that she can be safely and effectively treated at a less restrictive level of care.
   B. If the treatment plan implemented is not leading to measurable clinical improvements [in] the moderate-to-severe symptoms and/or behaviors that led to this admission and a progression towards discharge from the present level of care, there must be ongoing reassessment and modifications to the treatment plan that address specific barriers to achieving improvement, when clinically indicated.
   C. The individual has developed new symptoms and/or behaviors that require this intensity of service for safe and effective treatment.
3. **All of the following must be met:**
   A. The adolescent and family are involved to the best of their ability in the treatment and discharge planning process.
   B. Continued stay is not primarily for the purpose of providing a safe and structured environment.
   C. Continued stay is not primarily due to a lack of external supports.

51. Cigna also maintains a set of expectations for Residential Mental Health Treatment for Children and Adolescents as follows:

> **Expectations for Acute Inpatient Mental Health Treatment for Children and Adolescents:**
>
> o A documented current diagnosis of a moderate-to-severe mental health disorder, per the most recent version of the Diagnostic and Statistical Manual of Mental Disorders, and evidence of significant distress/impairment.
>
> o Evaluation by a Board Certified/Board Eligible Psychiatrist with training and experience consistent with the age and problems of children and adolescents within 72 hours of admission who also reviews and approves the appropriateness for this level of care and consideration of alternative less restrictive levels of care and who

8

- sees the individual as frequently as clinically indicated throughout the duration of the admission, but no less than once weekly.
- A medical assessment and physical examination within the first 24 hours of admission, unless a physician determines that an examination within the week prior to the admission to the facility was sufficient.
- Residential treatment should occur as close as possible to the home and community to which the individual will be discharged.
- If out-of-area placement is unavoidable, there must be consistent family involvement with the individual and regular family therapy and discharge planning sessions, unless clinically contraindicated.
- Within 72 hours of admission there is outreach with existing providers and family members to obtain needed history and other clinical information, unless clinically contraindicated.

**Family Involvement -** *The treatment should be family-centered with both the patient and the family included in all aspects of care.* Therefore, prompt and timely family involvement is expected at every level of treatment plan development, unless doing so is clinically contraindicated or would not be in compliance with existing federal or state laws. Family involvement is important in the following contexts:

- **Assessment** - The family is needed to provide **detailed initial history** to clarify and understand the current and past events leading up to the admission.
- **Family therapy** is relevant to the treatment plan and will occur as frequently as needed to achieve the treatment goals, but no less than once weekly, unless clinically contraindicated, and should be on a face-to-face basis.
  - However, if the family lives more than 3 hours from the facility, telephone contact for family therapy must be conducted at least weekly along with face-to-face family sessions as frequently as possible.
  - Telephonic sessions are not to be seen as an equivalent substitute for face-to-face sessions or based primarily on the convenience of the provider or family, or for the comfort of the patient.

- **Discharge planning**
    - Therapeutic passes may occur, when clinically indicated, as part of the transition and discharge planning process, to allow opportunity to practice therapeutic skills/gains with the family.
- Ongoing academic schooling is provided to facilitate a transition back to the child's previous school setting.
- Young children (12 years and younger) will be admitted to a unit exclusively for children.
- **A Preliminary Treatment Plan** is completed within 48 hours of admission and a **Comprehensive Treatment Plan** is to be completed within 5 days that includes:
    - A clear focus on the issues leading to the admission and on the symptoms that need to improve to allow treatment to continue at a less restrictive level of care.
    - If this is a readmission, clarity on what will be done differently during this admission that will likely lead to improvement that has not been achieved previously.
    - Multidisciplinary assessments of mental health issues, substance use, medical illness(es), personality traits, social supports, education, and living situation.
    - The treatment plan results in interventions utilizing medication management, social work involvement, individual, group, and family therapies as appropriate.
    - The goal is to improve symptoms, develop appropriate discharge criteria and planning involving coordination with community resources to allow a smooth transition to a less restrictive treatment level of care, family integration, and a continuation of the recovery process.
    - All medical and psychiatric evaluations should include consideration of the possibility of relevant co-morbid conditions.
    - This plan should:

- Be developed jointly with the family and the child/adolescent.
- Establish realistic, specific, measurable, and achievable goals.
- Include treatment modalities that are appropriate to the clinical needs of the child or adolescent…
	- Individuals progress in their treatment at different rates. Medical Necessity and length of stay are to be assessed individually to ensure appropriate treatment for the appropriate length of time rather than based on a pre-determined program.
  - **Discharge planning** will start at the time of admission and include:
    - Coordination with community resources to facilitate a smooth transition back to home, family, work or school, and appropriate treatment at a less restrictive level of care.
    - Timely and clinically appropriate aftercare appointments, with at least one appointment within 7 days of discharge.
    - Prescriptions for any necessary medications, in a quantity sufficient to bridge any gap between discharge and the first scheduled follow-up psychiatric appointment.

**D.   Cigna's Claim Denial**

52. By letter dated June 4, 2018, Cigna advised Mr. Bennett that it was denying coverage for Ms. Bennett's residential treatment at Havenwood effective May 29, 2018.

53. As of May 29, 2018, Ms. Bennett was still in the course of her treatment at Havenwood, and her discharge date had yet been determined.

54. Cigna's denial was based on its determination that Ms. Bennett's continued stay at Havenwood after May 29, 2018, was not medically necessary.

55. By letter dated November 26, 2018, Mr. Bennett timely appealed Cigna's decision to deny residential treatment for Ms. Bennett at Havenwood after May 29, 2018.

56. By letter dated December 17, 2018, Cigna upheld the denial of residential treatment at Havenwood for Ms. Bennett after May 29, 2018.

57. By letter dated February 28, 2020, Mr. Bennett submitted additional information supporting residential treatment for Ms. Bennett at Havenwood and requested a second level appeal.

58. By letter dated July 10, 2020, Cigna upheld its decision to deny coverage for residential treatment Ms. Bennett received at Havenwood on the basis that it did not meet the criteria for medical necessity under the Policy.

59. Mr. Bennett has satisfied all conditions precedent to receiving benefits under the Cigna policy for Ms. Bennett's residential treatment at Havenwood.

## FIRST CLAIM FOR RELIEF
(Violation of 29 U.S.C. § 1132(a)(1)(B)))

60. Plaintiff incorporates by reference each and every allegation of this Complaint as if fully set forth herein.

61. Plaintiff brings this claim under 29 U.S.C. § 1132(a)(1)(B).

62. Cigna's denial of benefits under the Policy was incorrect, unreasonable, arbitrary, and capricious, because it was unsupported by the substantial weight of the evidence presented to them.

63. Defendants have failed to provide Plaintiff a full and fair review of the claim for benefits under the Policy.

64. Defendants ignored information that confirmed Ms. Bennett's residential treatment at Havenwood was medically necessary.

65. Cigna was operating under an inherent conflict of interest in adjusting Ms. Bennett's claim for benefits because CIGNA was essentially acting as both the payor of benefits and the administrator of the claim.

66. Pursuant to 29 U.S.C. § 1132(a)(1)(B), Plaintiff is entitled to recover benefits due to him under the Policy.

67. Pursuant to 29 U.S.C. § 1132(g), Plaintiff is also entitled to an award of his reasonable attorney fees and costs incurred in bringing this action.

68. Pursuant to C.R.S. § 10-3-1116(2), CIGNA's denial of benefits is subject to de novo review by the Court.

**WHEREFORE**, Plaintiff, Hannah Bennett by and through her Conservator, Paul Bennett, respectfully requests that this Court enter judgment in her favor and against Defendants Cigna Behavioral Health, Inc. and Cigna Health Life Insurance Company as follows:

a. For recovery of amounts paid for residential treatment at Havenwood due under the terms of the Policy;

b. For all pre- and post-judgment interest, statutory and moratory, as allowed by law;

c. For reasonable attorneys' fees and costs of suit herein as provided by statute; and

d. For such other and further relief as the law permits as this Court deems just and proper.

Dated this 30th day of March 2021.

Respectfully submitted,

**LEVIN SITCOFF PC**

*s/ Jeremy A. Sitcoff*
Jeremy A. Sitcoff
Robyn Levin
1512 Larimer Street, Suite 650
Denver, Colorado 80202
Telephone:  (303) 575-9390
Fax:  (303) 575-9385
jas@levinsitcoff.com
rl@levinsitcoff.com
***Attorneys for Plaintiff***

Plaintiff's Address:
2201 Wynterbrook Drive
Highlands Ranch, CO 80126